YELVERTON, J.
Susan Anne Hewitt Broussard died April 29,1997, from a self-inflicted gunshot wound. She was 45 years old. She left a will. A dispute arose between the two principal legatees over which one was the testamentary beneficiary of her financial assets. James Adams, testamentary executor of her estate, filed a declaratory action to get an interpretation of the will and resolve the dispute. Steven Willis on behalf of his minor child, Timothy Scott Willis (Scott), who was a particular legatee, and St. Elizabeth Seton Catholic Church (St. Elizabeth Seton), the residuary legatee, are the legatees who claimed ownership of the financial assets. Finding that the testament was ambiguous, the trial court heard testimony about Susan’s intent when she made the will. After a four-day trial, the court ruled that Susan intended for the assets to go to St. Elizabeth Seton.
The disputed financial assets are described in the declaratory judgment as:
1. Two (2) Prudential Discovery Plus Annuity policies nos. 98648960 and 98648961 further identified under account numbers TCS-029999-09 in the name of Susan Anne Hewitt with Prudential Securities Incorporated.
2. Stocks and bonds in various accounts in the name of Susan Anne Hewitt with Prudential Securities Incorporated, including account numbers TCS-029999-09, TCS-R07131, TCS-074811.
3. Stocks in Money Market Fund with Hibernia Investment Securities, Inc. in the name of Susan Anne Hewitt, account number 4R6-196213.
4.Remaining cash on hand or any cash due the estate.
The trial judge found that what he described as “the Prudential portfolio,” consisting of all Prudential investments including the annuities, together with the Hibernia Bank account, made up the bulk of the deceased’s financial assets. The trial judge said “I do not believe it was her intention to leave Timothy Scott Willis any stock, any pbonds, any annuities, any investments, or any liquid financial assets of any kind.” Willis appeals this ruling. Finding no error, we affirm.
THE TESTAMENT
The following is the body of the testament dated June 25,1996:
I, SUSAN ANNE HEWITT BROUS-SARD, presently married to but living separate and apart from Lewis Glynn Broussard, domiciled in the Parish of Lafayette, Louisiana, being of sound mind and body and realizing the uncertainty of life, do hereby make this Last Will and Testament, expressly revoking any and all other wills and codicils heretofore made by me.
FIRST: I desire that at my death all my just debts be paid. •
SECOND: I give and bequeath at my death to TIMOTHY SCOTT WILLIS the following-described property:
A house and approximately 1.273 acres of land located at 1212 Wilderness Trail North, Carenero, Louisiana (Section 98, Township 8 South, Range 5 East), said house and land hereinafter collectively referred to as “Carenero Property.”
THIRD: I give and bequeath at my death to TIMOTHY SCOTT WILLIS my personal property found in, on, under, and/or around the Carenero Property and in my safety deposit box(es). The following is a non-exclusive list of items that are included in said personal property: clothing, jewelry, pictures, furniture, linens, cooking and eating utensils, wall hangings, rugs, insurance policies, stocks, bonds, ne *8 gotiable instruments, china, crystal, silver, family heirlooms', and other memorabilia of a personal nature.
FOURTH: I give and bequeath at my death to the LAFAYETTE PARISH PUBLIC LIBRARY any and all of my musical instruments and sheet music of which I die possessed.
FIFTH: I give and bequeath at my death to JOHN MCLEMORE HEWITT and KATHERINE HEWITT, children of John Howard Hewitt, the following-described property: *
One-half Qk) interest in and to a two-acre parcel of ground, with improvements, located at 415 Bertrand Drive, Lafayette, Louisiana (S P Lot 8; all of Lots 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, and 85; and S P of Lot 89, Hornsby Subdivision).
| ¡¡SIXTH: I give and bequeath at my death to HIBERNIA NATIONAL BANK, LAFAYETTE, LOUISIANA, as Trustee in Trust, the remainder of all of the property of which I die possessed for the use and benefit of ST. ELIZABETH SETON CATHOLIC CHURCH, LAFAYETTE, LOUISIANA, as provided below:
The monies left in Trust shall be invested and, commencing 13 months after the creation of the Trust, all of the earnings shall be payable to ST. ELIZABETH SETON CATHOLIC CHURCH, LAFAYETTE, LOUISIANA, as income beneficiary, to be used for the purpose of operating and maintaining ST. ELIZABETH SETON CATHOLIC CHURCH on a sound business-like basis.
ST. ELIZABETH SETON CATHOLIC CHURCH shall be the principal beneficiary of the Trust. The Trust shall have the maximum term permitted by law. The Trustee shall have the complete authority and full power to manage and control the Trust Estate and to sell, exchange, lease (for options, rent, mortgage, pledge, assign, transfer, or otherwise), grant options, rent, mortgage, pledge, assign, transfer, or otherwise dispose of all or any part of the Trust upon such terms and conditions as it may see fir [sic]; and it may invest and reinvest all or any part of the Trust upon such terms and conditions as it may see fit; and it may invest and reinvest all or any part of the Trust Estate in such stocks (common and preferred debentures shares or participation in any common fund), bonds, notes, securities, or other property (domestic or foreign), whether of the class or kind now or hereafter ordinarily approved or held to be lawful for the investment of trust funds or not, as it may, in its absolute discretion, select; and it may make and change such investments from time to time according to its discretion. The Trustee shall have further power to continue to hold any stocks, securities, or other property which it may receive hereunder; and the Trustee may invest any part of the Trust Funds in property located outside the State of Louisiana. The Trustee may register securities in its own name or in the name of nominees without disclosing the Trust.
The Trustee shall have full power to determine whether any money or other property coming into its hand, concerning which there may be any doubt, shall be considered as a part of the principal or income of the Trust Estate, and to apportion between such principal and income any loss or expenditure in connection with the Trust Estate as it may deem just and equitable.
The Trustee shall serve in said capacity without the necessity of furnishing bond.
The bequest made to the Trustee herein shall not be subject to the payment of any inheritance or estate tax, whether imposed by the federal government or the State of Louisiana or other political subdivision. Such inheritance and estate taxes shall be charged to and paid out of my gross estate.
*9 RLASTLY: I name and appoint JAMES J. ADAMS to be the sole testamentary executor of my estate with full seisin thereof and without the necessity of him having to furnish bond or any security while serving in such capacity.
The first issue on appeal is whether Susan’s intended disposition of the four disputed items of financial assets as between Scott and St. Elizabeth Seton can be ascertained from the language of the testament. If we agree with the trial court that her intent cannot be so ascertained, the second issue is whether the trial court’s interpretation of her intent from the extraneous evidence is manifestly erroneous.
THE DISPUTED PROPERTY
Susan’s safety deposit box was opened and inventoried on May 5, 1997. Fifty-eight items were found. The items included her will, some jewelry, personal papers, flood insurance policies, homeowner’s policies, and several other hazard policies. Also in the box were two Prudential annuity contracts. Willis argues that according to the will, his son, Scott, is entitled to receive the annuities, which are Item 1 of the above assets as described in the judgment, because the contracts were located in the safety deposit box. Willis likens these annuities to insurance policies. Both of thesé contracts show contract dates of September 28, 1992, and annuity dates of September 28, 2042. One reflects a purchase payment of $35,899.69 and the other a purchase payment of $36,651.92. The named beneficiary in both was Susan’s estate. Willis argues that his son is entitled to the remaining assets described in the judgment because the financial statements for those items were located inside the house in Carenero, and the house — the Carenero property — was left to Scott in the will along with her “personal property found in, on, under, and/or around the Carenero property and in my safety deposit box(es).” The Prudential securities investment records, Item | ¡¡2 of the financial assets described in the judgment, were a stack of monthly statements going back for years. Each statement contained a record of income and security transactions that had taken place in the account since the last reporting date. The Hibernia Investments Securities, Inc. account, Item 3, started out from the proceeds of a U.S. Treasury note in the amount of $30,000. In the bank box was a receipt evidencing the original purchase of that Treasury note, the proceeds of which had been reinvested with Hibernia. The records of the Hibernia investment account found in the house were monthly statements, similar to the monthly statements furnished by Prudential Securities Investments.
AMBIGUITY
Language is ambiguous when it can be reasonably interpreted to mean different things. The appellant, Willis, arguing that the will was not ambiguous, assigns error in admitting parole evidence to prove Susan’s intent. He claims that the language in the will is clear that Susan intended for his son to receive the annuities and other investments and funds.
The supreme court in Matter of Succession of Williams, 608 So.2d 973, 975 (La.1992), reviewed the law on interpretation of a will as follows:
The intent of the testator is the paramount consideration in determining the provisions of a will. La.Civ.Code art. 1712 [present La.Civ.Code art. 1611]. When a will is free from ambiguity, the will must be carried out according to its written terms, without reference to information outside the will. Id. However, when a provision in a will is subject to more than one equally reasonable interpretation, then the court may consider all circumstances existing at the time of the execution of the will (and not just the language of the will) which may aid in determining the intent of the testator. La.Civ.Code art. 1715 [present Article 1611].
*10 IfiThe trial judge ruled that the ambiguity in the case involved the interpretation of the language, “insurance policies, stocks, bonds, negotiable instruments,” appearing in the bequest to Scott and the application of that language to the assets described in the declaratory judgment. There were no certificates of stock, bonds, or negotiable instruments in the bank box, and none were found in the house. It could be argued that the annuity contracts were insurance policies. The named beneficiary in the annuity contracts, Susan’s estate, was assured of the right to receive a certain return of the investment on her death. However, the essential nature of these contracts was to create an annuity and not life insurance. The contracts in the safety deposit box were evidence of Susan’s or her estate’s right to money, but the money was not in the box, and mere possession of the contracts conferred no right of ownership of the investment. Evidence of the Prudential securities investments consisted of a stack of monthly statements. These were found in the house. The funds invested with Hibernia Investment Securities, Inc., were likewise evidenced by a monthly statement found in the house, and further by a receipt along the paper trail to the Treasury note that had been cashed to create the invested funds. The presence of these statements and papers in the house was argued to mean that Susan intended that the stocks and bonds in which much of the money in those accounts was invested would go to Scott. The trial judge concluded that the answers to these questions could not be found in her will.
The non-exclusive list of personal property in the disposition to Scott included both corporeal and incorporeal movables. The list contained a location restriction: “personal property found in, on, under, and/or around the Carenero Property and in my safety deposit box(es).” Bonds, annuities, and interests or shares in entities possessing juridical personality are incorporeal movables. La.Civ.Code art. 473. The |7location of Susan’s rights in these things is an issue, and the issue is not clear from the language of the will.
The legacy to Scott was also internally inconsistent. It began with the disposition of “my personal property.” In the middle of the disposition, the term “personal property” was again used followed by a nonexclusive list. Concluding the non-exclusive list, the word “personal” was once more used this time with the curious language “other memorabilia of a personal nature.” It is argued that she was attempting by that phrase to define what she meant by personal property, as being limited to objects valued in connection with her person.
The sixth disposition of the will designated “monies” left in trust as the remainder of the property of which she died possessed. It provided that the monies be invested and, commencing 13 months after the creation of the Trust, all of the earnings be payable to St. Elizabeth Seton as income beneficiary. As stated earlier, the trial judge found that the bulk of Susan’s financial assets were the Prudential investments. The residual disposition empowered the trustee “to continue to hold any stocks, securities, or other property which it may receive hereunder.” It is reasonable to interpret that language to be a reference to the Prudential portfolio and Hibernia investments as the monies left in trust.
These annuity contracts and the investments, especially the investments, amounted to a considerable sum of money. As we have demonstrated, reasonable arguments can be made by both sides that Susan intended by her will for the money to go to one or the other. Considering the nature of the assets, the trial judge concluded that the will was ambiguous. We agree. The finding that the will was ambiguous triggered the application of Civil Code article 1611, and authorities resort [sto the aid of “any competent evidence.” The trial judge considered parole evidence, and we *11 will now turn our attention to a discussion of that evidence.
INTENT
A great deal of the testimony focused on the relationship of Susan with the Willises and St. Elizabeth Seton. Willis’s wife and Susan had been friends since high school. Willis himself became acquainted with Susan in college when he began dating his wife. When Scott was born, the Willises had a home next door to Susan’s home in Carenero, which is the home she left to Scott. There is no doubt that there was a long and enduring. friendship between Susan and the Willises.
Susan began attending St. Elizabeth Seton when she married her husband, Glynn Broussard. Although not Catholic, she attended church regularly. She and her husband often had Father Harold Trahan, a Catholic priest, over for dinner. Upon realizing her talent in the gardening field, Father Trahan asked Susan for help at the church, and she began directing the planting and upkeep of St. Elizabeth Seton’s gardens. Even after her separation and divorce from Glynn, Susan continued working in the gardens, overseeing the planting of more than 70 trees, 150 bushes, and hundreds of flowers. There is also no doubt that Susan continued to participate in activities at St. Elizabeth Seton until her death.
There was also testimony about events, meetings, and issues that arose between the parties after Susan’s death. We find that none of this testimony resolves the question of Susan’s intentions.
James J. Adams, the executor of Susan’s will, was the attorney who prepared the will. “It is presumed that an attorney knows the law and has clearly expressed the testator’s intent in drafting the will.” Succession of Acy, 97-0661, p. 7 (La.App. 1 Cir. 4/8/98); 711 So.2d 341, 345. The trial court relied upon Adams’ testimony and the testimony of Susan’s former husband, Glynn, in ruling that it was Susan’s intent to leave all the financial investments to St. Elizabeth Seton. We quote from the trial court’s reasons for judgment:
Mr. James Adams’ testimony was unequivocal. He clearly and unequivocally testified that there was no doubt in his mind, from his interviews, discussions and sessions with Ms. Susan Broussard, his client, in preparation for the making of the February 1996 will, as well as the re-make of that will, or the new will that was made, and her final will in June of that same year, 1996 — he said that there was no doubt in his mind that she intended for her financial investments, her monies, to go to the trust, which was created on behalf of the residuary legatee, in this case, St. Elizabeth Seton Church.
It was absolutely clear in his mind that Timothy Scott Willis was to receive the home, the property in Carenero, and everything that existed in it, on it, under it, around it, and also, whatever might have been contained in the safety deposit box. We discussed the fact that there were six words in the will that created this dispute. Those words had to do with the non-exclusive listing of items which might fall under the bequest to Timothy Scott Willis. Those six words are “insurance policies, stocks, bonds, negotiable instruments.” However, Mr. Adams’ testimony was again unequivocal that there was no doubt in his mind that stocks, as used in the will, meant, in the mind of the testator, stock certificates, and not stocks in the sense of a movable, incorporeal, or personal property. He also testified unequivocally that the testator never spoke of annuities as insurance policies, and that she certainly knew the difference between annuities and other policies of insurance. He said that they specifically discussed the fact that annuity policies, or annuity contracts, were not to be included in the personal property bequest to Scott Willis, that they were specifically to go into trust with all of the other financial as *12 sets. There was never any discussion about the location of the annuity contracts or policies. In effect, that made no difference.
It was clear, again, in the will of June 25, 1996, in Mr. Adams’ mind, that she wanted all monies or financial assets to go into the trust.
Glynn Broussard was Susan’s husband. They were separated, but not divorced, when she made her last will. We quote the trial judge’s reasons for judgment regarding his testimony.
|inMr. Lewis Glynn Broussard, who testified, corroborated Mr. Adams’ interpretation or testimony regarding the intent of the testator. He specifically said that Susan Broussard did, in fact, discuss with him her intentions regarding her estate. He reiterated the concept that all her monies in the Prudential accounts were to go to the church, and it was his personal knowledge that based on their discussions, the annuities were, in Susan Broussard’s mind, part of the Prudential investment portfolio.
I find that both Mr. Adams and Mr. Broussard are credible witnesses who have no material interest whatsoever in the outcome of this lawsuit (and no other interest whatsoever that has been demonstrated in this lawsuit). They are absolutely disinterested witnesses insofar as which of the two legatees in dispute, the church and Mr. Willis, should get various assets.
The trial judge discussed what the evidence showed Susan meant by “personal property.” Several earlier testaments which she had made were introduced in evidence for comparison. We quote again from the reasons for judgment:
I noted the 1993 will of Susan Brous-sard as sort of a starting point for understanding what she meant by personal property. In that will, in the fifth paragraph, she leaves a bequest to Karen Kerswick Vincent, or her descendants. The wording of that bequest is “I give and bequeath to my first cousin, Karen Kerswick Vincent, or her descendants, any personal property found in my home in Carenero, Louisiana, and in my safety deposit box. Any furnishings of the home shall remain in the home until after my husband’s death.” That very simple statement “I give and bequeath any personal property found in the home in Carenero and in my safety deposit box,” was expanded, unfortunately, in the February 1996 will. When questioned about the choice of wording in the will, Mr. Adams candidly admitted he would never use that particular language again; He clearly testified, however, that what was meant by the listing, was that it was to be a representative listing of those things that a person might expect to find in and around a home. It was also a representative listing of those things that a person might find in a safety deposit box. He specifically said the term negotiable instruments was included because of some promissory notes that he was aware of. I’m convinced that that was the case. I’m convinced that what Susan Brous-sard meant by personal property located at the home or in the safety deposit box, had to do with memorabilia, or things associated with her as a person. It did not mean separate property. It did not mean property other than community property, as Mr. Willis has suggested.
lnThe evidence supports the trial judge’s conclusions. It happened that prior to the preparation of the wills by Adams, Susan had her wills prepared by another attorney, Jimmy Bean. Bean died, so she sought Adams’ help when she was ready to change the terms of her will. Before her last will was written, a statutory will was executed on February 1, 1996. Reviewing the events surrounding this will is helpful because that was the first time that the non-exclusive listing of property appeared. In the February 1996 will, she left the house to Scott subject to a life usufruct given to her husband. The contents of the house and the safety deposit box contents *13 were to go to a relative’s triplet children. However, furniture, linens, cooking and eating utensils, wall hangings, and rugs were specifically excluded from that disposition. Adams explained that Susan did not want the triplets to have the things that Glynn would need on a day-to-day basis. This was the will where, for the first time, St. Elizabeth Seton was named the residual legatee.
Explaining the non-exclusive listing, Adams testified that Susan wanted all the property inside of the house as well as outside of the house to go to the triplets with the exception of what Glynn would need. The triplets were supposed to get the jewelry, pictures, family heirlooms, and like things, which were not necessary for day-to-day living. Glynn was to receive items he would need to live in the house on a day-to-day basis.
After her separation from Glynn, Susan executed her last will, dated June 25, 1996, the one being interpreted now. In this will she removed any bequests to Glynn. She further removed the bequest to the triplets, now leaving the personal property found “in, on, under, and/or around the Carenero Property and in my safety deposit box(es)” to Scott. This time the nonexclusive listing included the furniture, linens,ijjjcooking and eating utensils, wall hangings, and rugs. Otherwise, the will was basically the same as the February 1996 will.
Glynn and Susan were married on February 13, 1988, and divorced on February 12, 1997. They had separated on June 6, 1996, just before her last will was executed on June 26, 1996. Glynn testified that it was Susan’s intent that all of her money, including the Prudential investments, pass to St. Elizabeth Seton. As observed by the trial judge, Glynn testified that Susan considered her annuities as part of her Prudential investments. He testified that Susan was giving the Carenero property to Scott because Scott’s parents owned the adjacent property and she wanted to keep the property together. At one time the property had been left to Scott’s mother, Vickey, but due to a disagreement concerning Glynn, Susan decided to leave the property to Scott instead.
Perhaps most telling in this case was Susan’s own handwritten notes on her personal stationery dated January 1996 and entitled “revised will.” These notes were prepared by Susan when she first went to talk to Adams about revising her will. Note (3) stated, “I give to St. Elizabeth Seton Church, Lafayette — cash [with ‘sale’ written above it] in trust with other monies.” Note (4) provided “all investments at Prudential Securities and all monies, anywhere, I give to same terms but to St. Elizabeth Seton Church instead of Hospice.” (Hospice of Acadiana was the residual legatee in earlier wills before St. Elizabeth Seton.) She then listed her current holdings in her own handwriting as:
(1) $375,000.00 in securities held by Prudential
(2) $4,500.00 in an IRA account held by Prudential
(3) $100,000.00 in annuities held by Prudential
(4) $60,000.00 cash at Prudential
(5) half-interest in lot at 415 Bertrand
(6) house & 1.3 acres of land
|13(7) community property holdings:
$18,000.00 stock acct @ Prudential Sec
$10,000.00 checking & Tower ac-couni/Hibernia
$30,000.00 treasury strip @ Hibernia
These handwritten notes indicated that Susan wanted all investments at Prudential and other monies to go to St. Elizabeth Seton.
Adams never knew exactly what was in Susan’s safety deposit box when the will was executed. He said that the language that was employed in the will was used because those were the items that are most commonly found in a safety deposit box. Susan told Adams that she had some bonds, promissory notes, and jewelry in the box. Adams testified that stocks re *14 ferred to stock certificates as opposed to just general stock holdings. Insurance policies, he explained, meant the hazard policies and automobile policies she owned. There was also at one time a promissory note in the box, but it had been paid by the time of her death. Adams further explained that the annuities were referred to as “annuities” and not insurance policies. Although Susan never told him where the annuities were located, Adams testified that Susan wanted the annuities to go into the trust that benefited St. Elizabeth Seton.
The location of the financial statements for Susan’s remaining financial assets in the house does not establish an intent that these assets were to go to Scott. We agree that the concept of mo-bilia sequuntur personam (movables follow the person) places the situs of an incorporeal movable at the domicile of the decedent. In re Howard Marshall Char. Remainder Annuity Trust, 97-1718 (La.3/4/98); 709 So.2d 662. However, this concept is generally applied only for jurisdiction determination purposes. The concept does not control location for succession purposes, as demonstrated by the facts in this case.
114The evidence in this case indicates that Susan’s intent was that St. Elizabeth Seton receive her financial assets as residual legatee. If she had intended that Scott receive everything, there would have been no need to write St. Elizabeth Seton in the will nor a need to specifically list the types of things that Scott was to receive, simply because there would have been no residuum. We do not agree with the argument that Susan intended for St. Elizabeth Seton to receive only her share of the community property that she would receive when she and Glynn separated the property. St. Elizabeth Seton was the residual legatee before Susan and Glynn were even separated. The only item that changed in the trust bequest after they were separated was that St. Elizabeth Seton then became the income beneficiary as well as the principal beneficiary.
A disposition should be interpreted in a sense in which it can have effect rather than in one in which it can have none. La.Civ.Code art. 1612. The only remaining assets were these financial assets. The evidence is clear that Susan intended for St. Elizabeth Seton to receive these assets, and it is the only interpretation that will give effect to the bequest to St. Elizabeth Seton. The trial court was correct in its declaratory judgment that St. Elizabeth Seton was entitled to these financial assets.
EVIDENTIARY RULING
There is one other issue on appeal. The record reveals that Adams and Glynn were the only people who had specifically discussed the contents of Susan’s will with her. The trial court did not allow testimony submitted by Willis regarding a statement made by Susan subsequent to the execution of the will. Willis submits that this was error.
11sWillis sought to introduce testimony from witnesses who heard Susan say that all the church would receive was her sweat and not her money. If provisions in a will are subject to two reasonable interpretations, a court may consider all circumstances existing • “at the time of the execution of the will” in determining the intent of the testator. Succession of Williams, 608 So.2d at 975. Any intent that Susan may have had after execution of the will was irrelevant unless it specifically related to the will itself. La. Code Evid. art. 803(3). There is no evidence to suggest that Susan was talking about her will when she made the statement that all the church would receive was her sweat and not her money. This could have referred simply to compensation for expenses incurred in her gardening work at St. Elizabeth Seton and the fact that Susan intended to be reimbursed these expenses, although she gave freely of her labor.
*15 Furthermore, if the statement is given the meaning argued by Willis, it would as arguably have been an oral revocation of the bequest to St. Elizabeth Seton. “[A]n oral declaration of a desire to alienate is not an act of alienation, and cannot have the effect of revocation.” Succession of Jackson, 00-31, p. 9 (La.App. 3 Cir. 7/26/00); 770 So.2d 804, 810. “Testamentary dispositions cannot be established by any amount of parole evidence as to the verbally declared intentions of the deceased.” Id. Therefore, even if these statements were admissible and could be considered as an expression of an intent by Susan to revoke that part of the will, that evidence would not operate to revoke the legacy left to St. Elizabeth Seton. This rule is consistent with the law that it is the intent of the testator at the time of the making of the will that is important.
11fiCONCLUSION
For these reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Steven J. Willis in his capacity as the administrator of the estate of his minor child, Timothy Scott Willis.
AFFIRMED.